**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-66 TSC** |
| **v.** | : | |
| | : | |
| **SPENCER OFFMAN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant, Spencer Offman, to 45-days incarceration and one-year supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I. Introduction

Defendant, Spencer Offman ("Offman"), a 34-year-old produce manager, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Offman pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1).   The government's recommendation is supported by the defendant (1) assisting other rioters in passing forward a metal bike rack to rioters closer to police; (2) entering the Capitol building through a broken window; (3) having recent criminal history, including an additional offense committed after January 6; and (4) lying to interviewing agents.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Offman's crime support a sentence of 45 days' imprisonment, one year of supervised release, and 60 hours of community service in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1 (Statement of Facts) at pp. 1-2; ECF No. 19 (Statement of Offense) at ¶¶1-7.

### Defendant Offman's Role in the January 6, 2021 Attack on the Capitol

On the morning of January 6, 2021, Offman flew from Detroit to Washington D.C. to attend the "Stop the Steal" rally.  He arrived early, getting to the Ellipse approximately one hour before the then-President's speech began and remained until the speech concluded.  Afterward, he joined the crowd on the march toward the Capitol.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Upon arriving at restricted Capitol grounds, Offman could hear rioters yelling at police officers and tearing down barricades. Offman joined in the melee by working with other rioters to move large objects, such as bike racks, that had been used by the police as barricades. For instance, while on a platform adjacent to the Northwest Stairs, Offman helped rioters pass a bike rack forward towards those rioters directly in front of police at the top of the Northwest Stairs, presumably so those rioters could use the bike rack as a weapon against those officers. *See* Image 1.



*Image 1*
(Offman, on a platform adjacent to the Northwest Stairs, working with other rioters to pass a bike rack closer towards rioters higher up the Northwest Stairs)

3

After accomplishing that task, open-source video reveals that/ Offman joined other rioters at various locations outside the Capitol.



*Image 2*
(Offman carrying two bike racks as he moved up the Northwest Stairs)



*Image 3*
(Offerman at the Capitol)

Undeterred by the chaos outside of the Capitol building, Offman pushed ahead toward the Senate Wing Door of the building, which had been previously breached by other rioters at approximately 2:13 p.m.  By the time Offman approached the Senate Wing of the Capitol building, he had donned a face covering in an apparent attempt to conceal his identity.



*Image 4*
(Open-source video of Offman, wearing a red face covering and  approaching the Senate Wing of the Capitol Building as other rioters climbed into the building through a broken window)

From his vantage point, Offman observed a shattered window adjacent to the Senate Wing Door and throngs of rioters streaming into the building.  He joined them: Offman entered the Capitol building through that broken window at 2:53 p.m.



*Image 5*
(CCTV footage showing Offman entering the Capitol building at approximately 2:53 p.m. by climbing through a broken window)

While inside the Capitol building, Offman remained in full view of a CCTV camera in the Senate Wing.  Soon after entering, Offman retrieved his cell phone from his jacket pocket and photographed the mob in the crowded vestibule adjacent to the Senate Wing Door.

 

*Image 6*
(Offman holding up his cellphone)

*Image 7*
(Offman taking a photo near the Senate Wing Door)

Wanting to memorialize his own participation in the riot as well, Offman then took a selfie. To accomplish that, he turned his back toward the crowd to ensure they would be in the photograph, lowered the bandana covering his face, turned the phone's screen toward himself, and took the picture.



- *Image 8a* (top center, CCTV footage of Offman pulling down his red face covering to take a selfie)
  - *Image 8b* (left bottom, zoomed in view of Offman in Image 8a)
  - *Image 9* (right bottom, CCTV footage of Offman holding his cellphone)

After taking commemorative photos, Offman exited the Capitol building through the same broken window through which he had entered. *See* Image 11. Offman spent a total of six minutes inside the Capitol building, the entirety of which was spent in the crowded vestibule adjacent to the Senate Wing Door.



*Image 11*
(CCTV footage showing Offman exiting the Capitol building by climbing back through the broken window he had used to enter)

*Defendant's Interview*

On May 19, 2021, FBI agents interviewed Offman regarding January 6. Offman participated in the interview voluntarily. During the interview, he admitted to traveling to Washington D.C. on January 6, 2021, attending the Stop the Steal rally, marching toward the Capitol, and witnessing acts of violence. His candor ended there, however. What followed was a series of lies designed to minimize his conduct on January 6. For instance, Offman told the interviewing agents that the behavior he witnessed by other rioters "did not support what he was present for" so he decided to leave the area immediately. Offman double downed on that lie by telling agents that he did not go onto the grass, did not go inside the Capitol building, and did not

even approach the Capitol building or any of the temporary structures erected for the inauguration, but instead he never went any further than the Capitol parking lot.

Based on Offman's lies during the interview and disingenuous cooperation, the investigation was initially closed. Offman's lies were exposed almost a year later when, in April 2022, the FBI obtained images of Offman moving barricades at the Capitol and subsequently began reviewing video of the riot that depicted him on the grounds, near the temporary structures erected for the inauguration, and inside the Capitol building itself.

*The Charges and Plea Agreement*

On February 6, 2024, the United States charged Offman by a four-count Information with violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). ECF No. 10. On March 15, 2024, pursuant to a plea agreement, Offman pleaded guilty to Count 1 of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Offman now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[2] | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 43-51.

The U.S. Probation Office calculated Offman's criminal history as a I, based on one criminal history point for his 2018 conviction for operating a vehicle while impaired.[3]  PSR at ¶ 55.   Accordingly, because the U.S. Probation Office calculated Offman's total adjusted offense

---

[2] The specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii). ECF No. 18 at ¶ 4(A). On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B).

[3] Although a misdemeanor or petty offense conviction for careless or reckless driving is not counted as a prior sentence for purposes of the Criminal History calculation (U.S.S.G. § 4A1.2(c)(1)), "[c]onvictions for driving while intoxicated or under the influence (and similar offenses by whatever name they are known) are *always* counted, without regard to how the offense is classified" (U.S.S.G. § 4A1.2, cmt., n.5) (emphasis added).

level, after acceptance, at 4,[4] his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 94.  Offman's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.   ECF No. 18 at ¶ 4(D).

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 45 days' incarceration, one year of supervised release, and 60 hours of community service.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Offman's

---

[4] As the parties acknowledged in their plea agreement, Offman is not eligible for a two-level reduction pursuant to U.S.S.G.§ 4C1.1 because he received a criminal history point.  ECF No. 18 at ¶4(C); see also U.S.S.G. § 4C1.1(a)(1).

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Offman, the absence of violent or destructive acts is not a mitigating factor. Had Offman engaged in such conduct, he would have faced additional criminal charges.

For purposes of sentencing, the most important factors in Offman's case are that he passed forward bike racks that were functioning as barricades, entered the Capitol building through a broken window, his criminal history, and his attempt to deceive the FBI agents who interviewed him. Offman knew full well that the barricades that stood before him and the Capitol building was a clear indication that entry onto the grounds was illegal. To be sure, upon seeing the barricades Offman could have done precisely what he told the FBI he did: turn around and walk away. Offman did the opposite: he assisted in passing the bike racks forward, and, after successfully doing so, ventured further onto the grounds.

Similarly, Offman was confronted with another choice when he eventually reached the Senate Wing Door. It was unmistakable that the Senate Wing Door had been the site of a violent breach: the adjacent windows had been shattered and the door was surrounded by a mob of rioters. Despite that, Offman not only moved forward into the Capitol building, but he opted to enter through a shattered window.

Finally, Offman was dishonest to the interviewing agents, which hindered the investigation. Offman initially only pretended to cooperate, falsely portraying himself as a bastion of civic responsibility. He told the agents that once he witnessed the full extent of the riot, he left without ever going any farther than the Capitol parking lot, indicating that he did not go onto the grass, did not go inside the Capitol building, and did not even approach the Capitol building or any of the temporary structures erected for the inauguration. But as video evidence discovered later

demonstrates, Offman did go onto the grass on restricted Capitol grounds, went up the Northwest Stairs (assisting other rioters with moving heavy objects on his way to the building), and he entered the Capitol building, where he took photos of himself and other rioters.  He clearly and knowingly lied to interviewing agents.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 45 days' incarceration, one year of supervised release, and 60 hours of community service.

### B.  Offman's History and Characteristics

As set forth in the PSR, Offman's criminal history consists of two prior arrests for driving while under the influence.  PSR at  ¶¶ 53-54.  The first occurred in November 2017 in Michigan and involved Offman crashing into another vehicle after having had multiple shots of vodka.  PSR at ¶ 53. For that offense, Offman was sentenced to a large fine or 93-days incarceration, followed by 12-months of probation.  *Id*.  Offman's second arrest occurred in March 2023, after his participation in the Capitol riot.  Id. at ¶ 54.  Offman's prosecution was deferred for that offense on the condition of 24-months of active supervised probation, including attending substance abuse treatment.  *Id*. at ¶¶ 54, 77.

In terms of personal characteristics, nothing in Offman's background provides this Court with mitigating circumstances.  He grew up in a stable household which provided him his essential needs and was fortunate enough to live in a peaceful neighborhood.  *Id*. at ¶ 63.  He appears to have a stable work history and has not suffered from any mental health issues.  *Id*. at ¶¶ 63, 73.  He has, however, received treatment for substance abuse issues – as noted above attending substance abuse treatment is a condition of his deferred prosecution.  *Id*. at ¶¶ 74-77.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

Despite falling in Criminal History Category I, Offman nonetheless has committed offenses both before and after the January 6 riot at the Capitol, which reveals a clear pattern of disrespect for the law.  Even after receiving a sentence of a large fine or 93 days in jail, along with 12 months' probation, for his 2018 DWI conviction, se*e* PSR ¶ 53, Offman committed a second DWI – after the January 6 riot, *see id.* ¶ 54.  That pattern of recent offenses establishes that Offman currently harbors a disrespect for the law and requires specific deterrence.

Further, Offman has not taken any steps, of which the United States is aware, to denounce his actions on January 6, 2021, including to the Probation officer who conducted his PSR interview.  When interviewed by the FBI, Offman chose to lie rather than accept responsibility or express remorse.  Thus, the Court should view any remorse he expresses at sentencing with skepticism at best.  Indeed, this Court has recognized that late remorse carries with it little weight. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

**E.  The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Offman based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Offman has pleaded guilty to Count 1 of the Information charging him with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) . This offense is a Class A misdemeanor. 18 U.S.C. § 3559.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Michael Dillon*, 23-cr-108 (TSC), defendant Dillon similarly pled guilty to a misdemeanor charge of 18 U.S.C. § 1752(a)(1).  Like Offman, Dillon saw chaos and violence

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

before entering the Capitol building but still proceeded to enter; entered the Capitol building through the same broken window next to the Senate Wing Door at around the same time (Dillion entered at 2:50 p.m. and Offman entered at 2:53 p.m.); spent a brief time in the Capitol building (Dillion spent five minutes inside the building and Offman spent six); and lied in at least one interview with agents (e.g., Dillon falsely claimed that he did not see violence against officers, that he was let into the Senate Wing  Door by police, and that he went inside the building to protect officers).  Unlike Offman, Dillion chanted while inside the building (Dillion chanted "Do your job!") and joined in a rendition of the Star-Spangled Banner outside. However, Dillion did not take selfies or photographs of other rioters, and did not pass bike racks to other rioters, as Offman did here.  This Court sentenced Dillion to 45 days' incarceration and 12 months of supervised release.

In *United States v. Ryan Kelley*, 22-cr-222 (CRC), defendant Kelley also pled guilty to a misdemeanor charge of 18 U.S.C. § 1752(a)(1).  Like Offman, Kelley saw chaos and violence but still proceeded to stay on Capitol grounds; assisted other rioters (similar to Offman, while on the platform adjacent to the Northwest Stairs, Kelley supported another rioter who was passing forward a metal bike rack to rioters closer to police); and recorded the chaos (Kelley took both photos and video while at the Capitol).  Distinct from Offman, Kelley was present for the breach of the scaffolding adjacent to the Northwest stairs, helped rip a protective tarp covering the scaffolding adjacent to the Northwest stairs, and used social media, including Kelley's campaign website for Michigan governor, to making light of the riot, falsely deny that any violence took place, and insist that he engaged in no wrongdoing.  However, Kelley did not enter the Capitol building or lie to agents as Offman did here.  Judge Cooper sentenced Kelley to 60 days' incarceration and one year of supervised release.  During sentencing, Judge Cooper noted Kelley's helping to pass the bike racks as a consideration ("You were at the front of the first group of rioters

that overwhelmed officers on the northwest stairs. That was a very important flash point… I've had two jury trials where all of the evidence has been about what happened on those stairs… I know why they were passing up those bike racks. I know what happened with the bike racks… You saw all that in front of you [the police line on the Northwest Stairs being overwhelmed] based on where you were, but instead of avoiding it, you called up more people, helped others pass up those bike racks…"). *U.S. v. Ryan Kelley*, 22-cr-222 (CRC), ECF 52 (Sentencing Tr.), at pp. 30-31.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.  Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Offman  must pay $500 in restitution, which reflects in part the role Offman played in the riot on January 6.[7] Plea Agreement at ¶ 10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.*  Offman's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 94.

## VII.  Fine

The defendant's conviction for a violation of 18 U.S.C. 1752(a)(1) subjects him to a statutory maximum fine of $100,000.00.  *See* 18 U.S.C. § 3571(b). In determining whether to

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $500 to $9,500.  U.S.S.G. § 5E1.2(c).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Offman's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C Bar No. 481052

By: */s/ Jack Burkhead*
    JACK BURKHEAD
    Assistant U.S. Attorney
    NM Bar No. 10493
    601 D Street, N.W.
    Washington, D.C. 20579
    (202) 809-2166
    jack.e.burkhead@usdoj.gov