```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


  UNITED STATES OF AMERICA,        .
                                   .
            Plaintiff,             .  CR No. 24-0066 (TSC)
                                   .
       v.                          .
                                   .
  SPENCER OFFMAN,                  .  Washington, D.C.
                                   .  Friday, July 12, 2024
            Defendant.             .  11:00 a.m.
   . . . . . . . . . . . . . . . . .
```

```
                 TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE TANYA S. CHUTKAN
                  UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

```
For the Government:           JACK E. BURKHEAD, AUSA
                              U.S. Attorney's Office
                              601 D Street NW
                              Washington, DC 20530

For Defendant:                JANE IMHOLTE, ESQ.
                              Office of the Federal Defender
                              188 W. Northern Lights Blvd.
                              Suite 700
                              Anchorage, AK 99503

Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue NW
                              Washington, DC 20001
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2                    (Via Videoconference)

 3          THE DEPUTY CLERK:  And we're on the record

 4     in criminal case 24-66, the United States of America versus

 5     Spencer Offman.  Starting with government counsel, please

 6     state your appearance for the record.

 7          MR. BURKHEAD:  Good morning, Your Honor.  Jack Burkhead

 8     on behalf of the United States.

 9          THE COURT:  Good morning.

10          MS. IMHOLTE:  Good morning.  Jane Imholte on behalf of

11     Spencer Offman, who is present.

12          THE COURT:  Good morning, Mr. Offman.  Can you hear me

13     okay?

14          THE DEFENDANT:  Yes, Your Honor.  Good morning.  This

15     is Spencer Offman.

16          THE COURT:  Okay.  Good morning.

17       Do we have anyone else on the call?

18          MS. BROUGHTON:  Good morning, Your Honor.

19     Candace Broughton on behalf of the probation office.

20          THE COURT:  Good morning.

21       Okay.  And Ms. Imholte, are you in Alaska, or where are

22     you?  Or Washington state?

23          MS. IMHOLTE:  Well, I reside in Alaska, but I'm with

24     my client here in Oregon.

25          THE COURT:  Oregon.  That's right.  I knew you were out
```

1 of the Alaska office.  It's a little early where you are,

2 I guess.

3  We are here for the sentencing of Mr. Offman, who has

4 pleaded guilty to entering and remaining in a restricted

5 building or grounds in violation of 18 U.S.C. § 1752(a)(1).

6  In preparation for this sentencing, I have received and

7 reviewed the presentence report and sentencing recommendation

8 from the probation department, as well as the plea agreement

9 and statement of offense that Mr. Offman executed along with

10 his counsel and the government, and sentencing memoranda

11 that I have received from the government and the defense.

12  Attached to that, to the defense memoranda, were several

13 emails from various individuals in support of Mr. Offman, and

14 I've also reviewed those.  So that's what I've looked at in

15 preparation for this.

16  So let me first begin with the presentence report, which

17 the final report and sentencing recommendation were filed on

18 June 27 of this year.  The report notes objections from the

19 defense and for the court's consideration, none from the

20 government.  Is that correct, Mr. Burkhead?

21   MR. BURKHEAD:  Yes, Your Honor.

22   THE COURT:  Okay.  So first let me start with the

23 factual recitations in the presentence report.

24  Mr. Burkhead, you have no objection to any of the factual

25 statements set forth in the report; is that correct?

1          MR. BURKHEAD:  Correct.  No objections from the

2     government, Your Honor.

3          THE COURT:  And do you plan on presenting any testimony

4     or evidence as part of this sentencing?

5          MR. BURKHEAD:  No, Your Honor.

6          THE COURT:  Okay.  Mr. Offman, are you fully satisfied

7     with the services of Ms. Imholte as your lawyer?

8          THE DEFENDANT:  Yes, Your Honor, I am.

9          THE COURT:  Have you had enough time to talk with her

10    about the presentence report and the probation department's

11    recommendation?

12         THE DEFENDANT:  Yes, Your Honor, I have.

13         THE COURT:  Have you gone over the presentence report

14    with your lawyer?

15         THE DEFENDANT:  Yes, Your Honor, I have.

16         THE COURT:  Okay.  Ms. Imholte, have you and Mr. Offman

17    read and discussed the presentence report?

18         MS. IMHOLTE:  We have, Judge.

19         THE COURT:  Now, I understand you have an objection to

20    paragraph 29, which states: "In April 2022, a tipster

21    contacted the FBI to provide images of Spencer Offman moving

22    the barricades at the Capitol, and the investigation was

23    reopened to search for additional footage."

24     That paragraph is then followed by two images depicting an

25    individual identified as Mr. Offman holding up a barricade,

1    and the objection states that Mr. Offman did not actively move

2    the barricade.  Is that the objection, that he is -- you're

3    not depicting that the photograph is somehow not him, are you?

4        MS. IMHOLTE:  No.  No.  You are correct.

5        THE COURT:  There's a photograph of him holding up the

6    barricade, but you're saying he did not -- what do you mean

7    "did not actively move it"?  I mean, to lift it up, you've got

8    to move it, right?

9        MS. IMHOLTE:  It was more an act of inertia rather than

10    an act of will.  It was moving over his head, and he continued

11    to move it.  I addressed it in my sentencing memorandum.

12        THE COURT:  Well, I think that's more of how you

13    characterize that language.  I'm not -- I'm going to overrule

14    the objection and allow the language to remain in there.

15    Certainly, you're free to address how that language should be

16    interpreted in your allocution, and as I've seen in your

17    sentencing memorandum as well.

18      Other than that, are there any other disputed issues of

19    fact; that is, any other factual statements as set forth in

20    the report?

21        MS. IMHOLTE:  No, Judge.  Thank you.

22        THE COURT:  Okay.  Having already dealt with the

23    defense objection to the description of his contact with the

24    barricade, I will accept the factual recitation as set forth

25    in the presentence report regarding the circumstances of the

offense, and therefore the facts as stated in the report will
be my findings of fact for the purpose of the sentencing.

Now, moving on to the guidelines determination, the
presentence report lays out the probation office's calculation
of the advisory guideline range that applies in this case, and
that calculation was done using the 2023 guidelines manual and
is as follows:  Beginning with the guidelines offense level --
and Mr. Offman, have you been through this with your lawyer?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And I believe you have -- other than that
previous offense which involved driving while impaired, you've
never appeared in federal court before this case, have you?

THE DEFENDANT:  That is correct, Your Honor.

THE COURT:  All right.  So I'm going to go through
now -- the sentencing guidelines are not mandatory, but they
apply to every criminal case, except for certain classes of
misdemeanors, and they apply in your case.  And I'm required,
as every judge is, to go through them and consider them in
every case, which is what I'm doing now.

I will tell you that, as you know from discussing with your
lawyer, it's very formulaic.  There are a lot of numbers, you
know, discussions of factors and ranges and so on that I have
to do this calculation.  It does not mean that I don't
consider you as a person, as an individual, and your
background and characteristics as well.  This is just a

1    calculation that I must do in every criminal case.

2        All right.  So the applicable guideline in this case is

3    §2B2.3, which has a base offense level of 4.  That base

4    offense level is then increased by two levels under

5    §2B2.3(b)(1)(A) because a trespass occurred at a restricted

6    building or grounds, which brings it to 6.

7        The government has also represented that Mr. Offman has

8    demonstrated acceptance of responsibility in a manner that

9    entitles him to a two-level reduction under §3E1.1(a).

10   Therefore, before I consider any departures or variances, the

11   total offense level is 4.  Is there any objection to that

12   calculation of the offense level, Mr. Burkhead?

13             MR. BURKHEAD:  No objection, Your Honor.

14             THE COURT:  Ms. Imholte?

15             MS. IMHOLTE:  No objection.

16             THE COURT:  Okay.  Moving on to the criminal history

17   category, the presentence investigation found that Mr. Offman

18   has one prior conviction that receives criminal history points

19   in the guidelines manual and that this conviction gives him a

20   criminal history subtotal of 1, which puts him in criminal

21   history category I.  Any objection to this criminal history

22   calculation, Ms. Imholte?

23             MS. IMHOLTE:  No.  Thank you.

24             THE COURT:  Mr. Burkhead?

25             MR. BURKHEAD:  No objection, Your Honor.

1          THE COURT:  Based on the offense level and criminal

2     history category I've just discussed, the presentence report

3     calculates the guidelines sentencing range to be zero to six

4     months of imprisonment.

5          Now, having determined the applicable guideline range,

6     I will consider any applicable departures.  The presentence

7     report doesn't include any departure grounds, and in the plea

8     agreement, both parties agreed that there are no grounds for

9     imposing a sentence outside of the guidelines range that is

10    based on the policy statements in the guidelines manual.

11         Is that your understanding, Ms. Imholte?

12              MS. IMHOLTE:  It is, Your Honor.

13              THE COURT:  Mr. Burkhead.

14              MR. BURKHEAD:  Yes, Your Honor.

15              THE COURT:  All right.  Now, 18 U.S.C. § 3553(a), which

16    lists all the factors I have to consider at sentencing, one

17    of them is I'm required to consider the statutory framework,

18    statutory penalties of the charges to which Mr. Offman has

19    pleaded guilty.

20         The charge of entering or remaining in a restricted

21    building or grounds, in violation of 18 U.S.C. § 1752(a)(1),

22    carries a statutory maximum penalty of one year of

23    imprisonment.  There is no mandatory minimum sentence.

24         Mr. Offman is also eligible for a sentence of up to five

25    years of probation, and the guidelines range for a sentence of

probation is up to three years.  If a term of imprisonment is
imposed, the statutes provide that Mr. Offman faces a
supervised release range following imprisonment of up to one
year, while under the guidelines that range is also a year.

The statute of conviction sets a maximum fine of $100,000,
while the guidelines fine range is between $500 and $9,500.
Special assessment of $25 is mandatory.  And as part of his
plea agreement, Mr. Offman has agreed to pay $500 in
restitution to the Architect of the Capitol.

Counsel, have I stated accurately the statutory framework
under which we're operating?  Mr. Burkhead?

MR. BURKHEAD:  I believe you have, Your Honor.

THE COURT:  Ms. Imholte?

MS. IMHOLTE:  Yes, Your Honor.

THE COURT:  Okay.  As you all know, the probation
office has issued a recommendation for a sentence in this
case.  Probation office's recommendation is 36 months of
probation, $500 in restitution, the mandatory $25 special
assessment.  As you all know, that recommendation is not
binding on the court.

All right.  At this point I would like to give the parties
an opportunity to address the court and to speak on any
factors that you think merit my special consideration.
Mr. Burkhead.

MR. BURKHEAD:  Thank you, Your Honor.

1          And I know the court has read the government's sentencing

2     memorandum, so I do not want to regurgitate all of that.  But

3     what I would like to do here is highlight some of the unique

4     factors in this case that apply under 3553(a) that warrants,

5     in the government's view, our recommendation of 45 days of

6     incarceration to be followed by one year of supervised release,

7     60 hours of community service, and $500 in restitution that

8     was agreed upon as part of the plea.

9          I want to start by --

10          THE COURT:  I'm sorry, Mr. Burkhead.  Let me interrupt

11     you.  Are you also asking for a fine?

12          MR. BURKHEAD:  We're deferring to the court on the

13     fine.  We're not affirmatively asking for a fine, however,

14     Your Honor.

15          THE COURT:  Okay.

16          MR. BURKHEAD:  All right.  I'm going to start by the

17     Senate Wing door where Mr. Offman entered.  And as the court

18     knows from the PSR and the sentencing memorandums, Mr. Offman

19     opted on January 6 to enter the Capitol through a broken

20     window.  Entered it through a broken window and exited through

21     the same window.  And what is -- there's probably many things

22     notable about his choice to do that, but one of the notable

23     facets is that there was a perfectly good doorway immediately

24     adjacent to the broken window in which Mr. Offman entered and

25     exited.

1      THE COURT:  You're not suggesting that it would have

2  been okay for him to go through that doorway, are you?

3      MR. BURKHEAD:  I am not at all.  He would have been

4  committing a crime if he would have been going through the

5  doorway at all.

6      THE COURT:  I've had a number of people in front of

7  me convicted for walking through those doorways.

8      MR. BURKHEAD:  And I was not suggesting that at all.

9  What I am suggesting is that there's a certain message

10  involved by going through the broken window that he is -- not

11  only has perfect knowledge that what he is doing is illegal,

12  he is willing to defy norms and the law to make whatever

13  statement he was trying to make that day.  There's a certain

14  emphasis by going through a broken window that puts a

15  punctuation mark on Mr. Offman's conduct that day.

16      I also want to speak for a moment about the metal bike rack

17  that was addressed both in the government's memorandum and the

18  defense.  I believe Ms. Imholte has already touched upon it

19  today that the defense view is that it was -- I think the

20  words that were used already this morning was "nothing more

21  than inertia" that accounts for the photograph that the court

22  has seen of Mr. Offman with the bike rack above his head and

23  his arms extended, supporting it in his effort to, in the

24  government's view, to move it forward.

25      And I don't in any way mean to be cavalier by saying this,

1    or chippie by saying this, but to make the claim that it's

2    just inertia and he was just supporting it to protect himself

3    seems to be too cute by half.  It certainly raises the

4    question, what in the world was he doing under the bike rack

5    in the first place if not to assist in moving it out of the

6    way.  And the clear inference that can be drawn is that he was

7    moving it out of the way in an effort to both clear the path

8    for himself and other rioters to get to where they wanted to

9    go that day.  The inference that he was just doing it to

10   protect himself, in the government's view, is not supported

11   by common sense.

12       Moving on to the 3553 factor of the history and

13   characteristic of the defendant, he's got two prior contacts

14   with law enforcement, both DWIs, one occurring before January

15   6, 2021, and the other occurring afterward.  There was about a

16   six-year span between the two.

17       With the first DWI, I'll confess to the court I'm not

18   entirely certain what sentence he received for that offense.

19   According to the PSR, he received 93 days' incarceration or

20   a large fine and also 12 months of probation.  I don't know

21   whether there was an actual sentence of incarceration or not

22   as part of that first offense.  History and experience tells

23   me there almost certainly wasn't for a first DWI offense, but

24   I can't really tell from the PSR.

25       What is apparent, however, is that Mr. Offman wasn't

1    deterred by whatever sentence he received his first go-round

2    because he picked up the same offense just a couple of years

3    later.  And why that is important is that Mr. Offman is asking

4    for probation today when we already know that probation

5    doesn't deter him.  It's not a specific deterrent to him

6    because he picked up a second DWI.

7        So if we're going to breathe life into that 3553(a) factor,

8    then I would respectfully suggest to the court that the

9    government's recommendation of 45 days of incarceration along

10   with the other aspects of the sentence that we're requesting

11   will do more, and perhaps far more, to specifically deter

12   Mr. Offman than would the sentence that he is requesting.

13       And the final factor I want to talk about is Mr. Offman's

14   lying to the agents who initially contacted him.  Before I

15   discuss that, I want to first acknowledge that the government

16   stands by its representation to the court that he has accepted

17   responsibility in this case, and, in fact to his credit, he

18   did so really quickly.  It was not long after he was charged

19   that he, to his credit, decided to enter the plea of guilty

20   that's before this court.

21       However, it should not be lost on this court, despite the

22   speed in which Mr. Offman opted to enter a guilty plea, that

23   was not plan A.  Accepting responsibility was not plan A for

24   him.  It was plan B.  Plan A was to try to lie his way out of

25   this when the federal agents contacted him.  And he told them

a series of untruths that day, which actually almost worked for him.  FBI did initially close the investigation until further evidence was developed that he was in fact doing things on January 6 that he didn't acknowledge to the agents that resulted in the charges that are before this court.

So it's for the totality of all of those factors, Your Honor, that the United States is requesting the sentence that we are.  I have nothing else, no further argument for the court, but I'm certainly happy to answer any questions that you may have.

THE COURT:  I don't have any questions.  Thank you, Mr. Burkhead.  Ms. Imholte?

MS. IMHOLTE:  Thank you, Judge.

I have spent quite a lot of time getting to know Mr. Offman since this case was charged, and I can report to the court that he is one of the most guileless clients I think I've represented, and I think you'll hear in his allocution some of that.

As counsel noted, Mr. Offman did take speedy accountability.  I don't know if the court will recall.  I don't think Mr. Offman had seen very much in the way of discovery when he decided to plead guilty.

THE COURT:  I remember that.

MS. IMHOLTE:  He wanted to plead guilty right away because he didn't want to be untruthful and deny his

involvement.  He was untruthful when initially encountered,
and he will explain that to you, Judge.  It had to do with --

THE COURT:  I'm sorry.  Wait, wait, wait.  Did you just
say he was truthful when he was initially interviewed by the
FBI or was untruthful?

MS. IMHOLTE:  No, untruthful.  That's correct.  That
he did minimize and try to deny his involvement out of fear
for losing a just-secured promotion.  Not an excuse but an
explanation.  And explanations, obviously, are going to differ
in the adversarial system here.  That's why we have it.  And
while it may seem cute, I think it is a valid argument with
respect to the bike racks, Judge.  They were moving.  And I
don't mean to minimize what they were.

But as I noted in my sentencing memorandum, it's similar to
a body surfer at a concert or a beach ball at a concert.  I
don't know that my client had any ability to stop the momentum
of that rack going over his head.  I don't want to get into it
too much, because I don't know that it's that significant of a
factor for the court, but I just want to point out that it's a
valid explanation, not one that's meant to be coy.  And you'll
hear about that from my client as well.

Mr. Offman was caught up in a moment that he sought, to a
certain extent, but one of the things that distinguishes him
from all of the cases that I was reading in preparation for
his sentencing -- and I noted some of them in my memorandum,

Judge, is he did not -- unlike so many others who appeared in your court and elsewhere, there was no lead-up to it like so many others on social media. There was no live broadcasting at the time. There was no boasting afterwards as some did to the media but also to their social media followers. I think that weighs fairly heavily in favor of probation's recommendation.

The government asserts, without any evidence, that Mr. Offman was putting a punctuation mark on a message, and I wish to challenge that and push back that he was hoping to deliver any message at all rather than being caught up in a moment and observing seeing what was going on and exiting fairly quickly as compared to other people.

Additionally, he left the grounds at that point, unlike others who re-entered. And Mr. Offman had no message that day. He had, I think, what is a driving force in his life: a curiosity and a desire to have experiences.

One of the things that I find most unique or interesting about my client is his job at Kroger. He has used it to see the world, or the United States. Coming from a small town in Michigan, moving out here to the West Coast all by himself, not knowing anybody, he's going to continue to relocate when he feels ready to move to various parts around the country.

And as I noted multiple times, he's had this career going on 15 years. Any period of incarceration may put that in

peril.  But it is one of the -- I find it a really telling
life choice that he selected a job that he loves and that he's
good at, but also that allows him to expand his horizons.  And
he has learned quite a lot since the three years that this
offense occurred and has had his worldview broadened by being
out here and away from home and meeting new folks.

I don't want to belabor my arguments in the sentencing
memorandum, Judge, but Probation does recommend that
Mr. Offman not serve any time in custody, and I think the
3553 factors support that.  I know that disparity between
defendants is only one of the factors, but given the number
of people who had much more egregious behavior on that day
receiving probation, I think my client should be the benchmark
for who does get probationary sentence and not a sentence of
detention.

As I noted, if the court does wish to impose detention, I
would urge them to contemplate home incarceration.  If there
is a period of detention ordered, my client would wish to
serve it at the Sheridan, Oregon, facility.  But I do think
that if anyone warrants a probationary sentence, it is my
client.

I wish to briefly address the fact that the government
says probation doesn't deter him from committing offenses.
I think that's somewhat of a specious argument given that
you're talking about a DUI.  That's a very different offense,

1    involving a substance abuse issue that my client has been

2    addressing.  He's been sober for a year and a half and totally

3    compliant with his DUI probation.

4        So Mr. Offman will not be back in your court or any court.

5    He's been very successful and had a lot of personal growth

6    because of his treatment for alcohol, and, as I noted, he's

7    living just a modest, healthy, quiet life out here in the

8    beautiful Oregon coast.  And if you don't have any questions

9    for me, my client would like to address the court.

10            THE COURT:  Thank you, Ms. Imholte.

11        Mr. Offman, when you pleaded guilty, I told you, and I'll

12    remind you now, that you would have an opportunity — an

13    absolute right, actually — to speak at your sentencing, but

14    you also have an absolute right not to speak.  And if you

15    don't want to say anything, you don't have to and I won't hold

16    that against you, but if you do want to say something, now is

17    the time.

18            THE DEFENDANT:  Yes, Your Honor.  I wrote down a small

19    speech, if I may present it to you.

20            THE COURT:  You absolutely may.  The only thing I'll

21    caution you on is we tend to speed up -- I do, most people

22    do -- we tend to speak faster when we read.  So if you could

23    just make sure you don't speak too quickly so that the court

24    reporter who is taking this down can get everything down.

25    Go ahead.

1          THE DEFENDANT:  You got it.  Yes, Your Honor.

2      On January 6, I initially went to D.C. not knowing what to

3  expect but rather seeking out an adventure.  I heard through

4  multiple media outlets that it was going to be one of Trump's

5  most exciting speeches and it was going to be, quote-unquote,

6  big.  I had no idea what big meant, but I sure wanted to find

7  out.

8      I bought a two-way plane ticket to fly in on the day of the

9  speech and to fly out the day after.  I traveled by myself, as

10  I have all of my other adventures.  Once I arrived to D.C.,

11  there was more people than I have ever seen in one gathering

12  in my whole life.

13      I'm going off my memory on this from three years ago.

14  Before the speech was over, I seen mass herds of people walk

15  in one direction mass after mass.  Curiosity led me to see

16  where everyone was headed.  I seen the crowds of people get

17  loud.  I seen them get destructive.  I seen them get riled up,

18  and I still pursued further as they pushed back one barricade

19  after the next.

20      I feel as though it is important to elaborate on this

21  detail.  The picture of the barricade over my head with my

22  mouth gaping open is captioned out of context.  I did not pick

23  that barricade up with the crowd; rather, the barricade was

24  passed down to me from a large crowd of a hundred different

25  hands.  Looking in an upward direction, I see a big metal

1    object heading towards my head.  I put both hands up to keep

2    it shuffling down the crowd.  That's no justification,

3    mentioning I did not pick up the bike rack.

4        I pursued the crowd as far as going inside of the Capitol.

5    The main entryway I think it's called.  The picture of me with

6    the bandana over my face was not to conceal my identity, but

7    rather an attempt to prevent myself from breathing in tear

8    gas.  Again, no justification behind the action, but those

9    were my thoughts, covering my face.

10       After taking three or so selfies and being in the first

11   room in the Capitol, I then realized enough is enough.  The

12   best way I can describe this situation was if I was in a movie

13   theater and the movie was playing and I didn't want to get off

14   of my seat and not see the end of the movie.  It go too

15   chaotic inside that first room of the Capitol, and that's when

16   I took off as quick as I could and found my way back to my

17   hotel -- (Interruption by court reporter.)  Oh, I'm sorry.

18            THE COURT:  Yes.  That's what I warned you about.

19   We do tend to speed up.  If you could just slow down a bit,

20   Mr. Offman.

21            THE DEFENDANT:  Your Honor, I plead guilty because I

22   know I need to take accountability.  Without accountability,

23   I can't learn from my mistakes.  And if I can't learn from

24   my mistakes, I can't grow as a human being and as a soul.

25   I believe we are always meant to be growing throughout our

1    lives, but I feel as though it's extremely important to

2    mention what I take accountability for.

3        My intentions of being there on January 6 were not

4    malicious, destructive, or even one-sided.  I honestly went

5    there for the adventure, but I take accountability on

6    trespassing on grounds that I knew I should not have been on.

7    I knew every single person should not have been on there.

8        I can honestly say, though, that I wanted no part in the

9    destruction.  It was observing -- and I didn't write this

10   down.  I take accountability, and through my therapy through

11   my DUI, I realize I'm a risk taker, and I take accountability

12   in not seeing the balance of the good risks in life that allow

13   you to get promotions and bad risks that lead you into

14   situations such as this.

15       If I have time, I would now like to tell you where I am now

16   as a person.  I believe the past three years for me I have

17   grown spiritually more than in my whole life.  Back in August

18   in 2021 I left my hometown in Michigan to take a leap of

19   faith.  I moved out west not knowing a single soul out here.

20   I got a job transfer through my job at Kroger that I'd been

21   with for 15 years now.  This has been a journey of trial and

22   error and plenty of obstacles, but I wouldn't change anything

23   from it.  I believe there is a learning situation behind every

24   encounter.

25       I moved from Michigan to Colorado to Utah to Washington to

where I am now in Oregon.  Each place not knowing anyone and

traveling through the channels of the Kroger Corporation.

I originally started this journey to be adventurous and see

different, miraculous wonders of this country.  But I

eventually learned that the friendships that I made with those

who were once strangers and through time accepted me into

their families as one of their own is by far the best part...

(Pause.)

THE COURT:  Take your time.

THE DEFENDANT:  Each person I lived with -- sorry.

MS. IMHOLTE:  Take a deep breath.

THE COURT:  It's all right.

THE DEFENDANT:  I wasn't expecting to do this.

I apologize.

THE COURT:  It happens.

THE DEFENDANT:  Each person that I've lived with and

worked with has a different way of thinking and it has opened

up my mind to human life from different angles.  From

coworkers to managers to landlords and roommates, meeting

these people and gaining their most moral support has been the

most incredible part of this journey that I love being on, and

most stay in touch to continue seeing how I'm doing.

Your Honor, I am ready to face the consequences that you

impose on me today.  Therefore, I can officially own up to

what I've done, learn from it, and most importantly, continue

1    to grow.  Thank you sincerely for hearing me.  Sincerely,

2    Spencer.

3            THE COURT:  Thank you, Mr. Offman.

4        Now it's my turn to do what I always say, which is true,

5    the most difficult part of my job but which is to impose a

6    sentence that is sufficient but not greater than necessary to

7    comply with the purposes of sentencing.  I have to do that in

8    every criminal case.  These purposes include the need for my

9    sentence to reflect the seriousness of the offense, to promote

10   respect for the law and to provide just punishment, to deter

11   criminal conduct, to protect the public from future crimes you

12   might commit, and to promote rehabilitation.

13       I must also consider the nature and circumstances of the

14   offense, the defendant's history and characteristics, the

15   types of sentences available, the need to avoid disparity, the

16   need to provide restitution.  I've considered all of these

17   factors, some more than others, because in every case some

18   factors will weigh more heavily, and I've done that here.

19       Actually, I usually start with the nature of the offense,

20   but I'm going to start with your characteristics as an

21   offender.  It is clear to me, both from reading the sentencing

22   memoranda, the presentence report, hearing from you today, the

23   things that others have said about you, that you are a seeker

24   and someone who is moving through life and trying to learn and

25   grow.  And that is to your credit.

One of the great things about this country is that people move around.  They find the place where they can put down roots, or they keep moving around and learning more about the very big country we live in.  And you seem to have been, and continue to be, on a journey of growth and exploration and self-discovery, and you're to be commended for that.  You're actually in the right part of the country for that.

But it's a big country, and there are all kinds of people and places to see and things to do.  So you're commended for a level of introspection and self-awareness that I see and I've heard about you're interested in healthy eating and healthy living and all those things, and it appears that you're working towards your sobriety, which is absolutely essential. If you are going to grow as a person, you have to learn to deal with addictions and dependencies on substances that make you make bad choices.  So you're to be commended for that, for all of that.

You know, you've had a long, long career with an organization that has allowed you to travel and fulfill your desire to move around the country, and where you seem to be a very valued employee, and I am hoping that this sentence does not interfere with that and you continue to work for a company that you appear to be very loyal and devoted to.  So there's a lot that is positive about your life and that I think will continue to be that way.

1    But I also have to talk about the nature of this offense,

2    because every time you refer to this as "an adventure," I sort

3    of, in my mind's eye, go back to what I and a good number of

4    people living in this country were seeing on January 6.  It

5    was not an adventure.  It was horrifying.

6    And maybe someone seeking new and different experiences

7    being there and the electricity of the crowd and the energy of

8    the crowd and the people and everything that was going on was

9    stimulating and exciting, but I can tell you, Mr. Offman, for

10   those of us who were watching from home, to those law

11   enforcement officers who were standing there outnumbered,

12   wondering if they were going to get killed trying to fend off

13   objects being thrown at them, weapons being used against them

14   or objects being used as weapons against them, and a crowd

15   screaming the most horrible things you can imagine, and to the

16   people who were inside that Capitol building trying to do

17   their jobs who were hiding under desks and making frantic

18   calls to their family out of fear that they would never speak

19   to them again, this was not an adventure.

20   And I don't hear in your words an understanding of the

21   seriousness of what was happening on January 6.  I think

22   you're able in your life to detach from emotion and sort of

23   just observe, and that's sometimes is a good thing.  But it

24   sometimes isn't, because far from being an adventure or

25   something to simply watch and look and see, there were people

carrying Nazi flags. There were people shouting the most
virulent and offensive statements. There were people among
you defacing the U.S. Capitol, destroying property,
desecrating the center of our government.

And I'm not saying for a minute that you condoned that
or had you participated in that. If so, you'd be here
pleading guilty to a felony. So, obviously, you didn't. But
it was no adventure. It was a violent attempt to stop the
peaceful transfer of power, a tradition that has continued
unbroken since the founding of this country.

And so it may have looked to you like, whoa, this is
cool, this is different, this is something, a new experience.
That may be true. But it wasn't that way to the people
who were afraid they were going to get killed. There were
flipping four suicides from the events of that day, from the
trauma that was inflicted to the law enforcement officers.
Two people died, at least two, one from amphetamine
intoxication and then another from a heart attack. And then
someone was shot.

The effects of that day are still being felt. I hear from
police officers and Capitol Police officers all the time who
talk about the effect it's had on their lives and their
interaction with their children and with their families and in
crowds. I've heard from officers who had to take early
retirement. I've heard from officers who are still struggling

1    with PTSD symptoms.  And one officer came and told me he

2    couldn't raise his arm above his shoulder, and he's had to

3    retire from a job he loves.  Most shockingly, we've had law

4    enforcement officers who are still getting vile threats and

5    being called names for doing their job that day.

6        So while I understand your characterizing this as an

7    adventure, I want to make it clear to you that this was

8    serious.  It was tragic.  It could have been much, much worse.

9    We're still feeling the aftereffects as we stare down the

10   prospect of another election that promises to be -- oh, who

11   knows.  So I didn't hear that from you, and I didn't hear from

12   you an appreciation of what the people who were there trying

13   to defend the Capitol were dealing with.

14       And so I'm going to mention this business of the bike rack

15   going above your head, like your lawyer mentioned, a beach

16   ball or crowd surfing.  Here's the thing, Mr. Offman:  Those

17   bike racks that were being passed along over your head, as

18   well as the other objects that were being passed along by the

19   crowd, were being passed along to be weapons against officers

20   who were fighting for their life.

21       They weren't being passed along to reimpose the barricade.

22   They were going to be used as weapons.  And I don't know how

23   you could not have known this, but certainly every -- everybody

24   there who allowed these barricades to be passed over their

25   heads and facilitated that facilitated the attacks against

1    that small but incredibly brave and determined number of law

2    enforcement officers who were simply trying to stay alive and

3    protect the people inside that building.  This is no concert.

4    Those barricades were being used to hurt people or try and

5    hurt people who were just trying to do their job.

6        Similarly, Mr. Burkhead's point about the broken window is

7    a valid one.  It's true, I've had people plead guilty and be

8    sentenced for walking through the doors.  Everybody who went

9    in that building knew they shouldn't have been in there.

10   Everybody.  There was no way you couldn't know.

11       You just said you covered your face because of the tear

12   gas.  Well, why is there tear gas?  There was tear gas because

13   they were trying to disperse the crowd because they shouldn't

14   have been there.  And so your climbing through that window,

15   which was broken, is a sort of a punctuation mark.

16       It does serve to display the determination that you had to

17   get inside that building.  You know, it does take a bit more

18   exertion and determination to climb through a broken window

19   than it does to walk through a door, despite the fact that

20   you're forbidden from doing both things.

21       So it's not just, oh, look what's happening; let me wander

22   over and check it out.  You were active in this event.  You

23   may not have intended to be active, but let me make it clear

24   that your presence there in the crowd, in that building,

25   helped to make sure that that riot almost succeeded.  Because

1    two people can't riot.  So when you saw what was going on and

2    you saw that mob and you decided I'm going to join them, you

3    helped them by your presence.  You helped them, and you helped

4    terrorize and terrify the people who were trying to keep that

5    building safe.  And it was no adventure to them.

6        With regard to the need to avoid unwarranted disparity,

7    I talk about this all the time.  I do look at other cases in

8    every instance, but I do look at my own, and I remember almost

9    all of these cases.  And every single case I have, I look at

10   all of the factors for each one.  I've given sentences -- you

11   know, odd numbers, 12 days or whatever -- because I do believe

12   the sentence should fit not just the crime but the offender

13   and their participation.

14       And these January 6 cases are sort of unique.  They're not

15   your typical misdemeanor cases.  They're not sort of the

16   typical guideline-range cases.  So I've looked at the other

17   cases that both your lawyer and the government have cited,

18   and I've also taken into account the fact that you were not

19   truthful with law enforcement when you were first interviewed.

20       I mean, I've raised two children.  It's sort of human

21   nature to deny culpability.  I don't think it means that

22   you're a horrible person or a hardened criminal.  It means

23   you didn't want to get in trouble, and you minimized and

24   falsified information about your participation.  I do take it

25   into account, because frankly, if there was true remorse about

1       what you did, you would have fessed up, and you didn't.

2           And as Mr. Burkhead said, it almost worked.  It took a

3       year for the FBI to get information that indicated you weren't

4       telling the truth and you were there and your participation

5       was more than you indicated.  So that's a factor I'm

6       considering.

7           But the other thing is I haven't heard you say you wish

8       you hadn't done it.  I've heard you say, here's why I did it.

9       It was sort of an adventure and an experience and I had it,

10      you know.  Done.  Over.  But I haven't heard you say, I wish

11      I hadn't done it; I realize now that what I did was wrong.

12      I haven't heard that.

13          And maybe you do feel that way, but I didn't hear that

14      in your very eloquent statement to me.  And I hope you do.

15      I hope, if nothing else -- you talk about your struggle with

16      sobriety and your desire to stay sober, and I know that part

17      of that is making amends, accepting responsibility.  You know,

18      there are steps.  I don't know if you're in a 12-step program,

19      but there is a process.

20          And so just as in that case, there's a process here for

21      rehabilitation, and part of that is owning up to what you did

22      and realizing the error of what you did.  And I hope it's

23      there.  I don't know, but I hope you have a sense now that

24      that was a terrible thing you participated in.

25          All right.  I have considered my previous sentences in this

1    case, sentences that other courts have imposed.  I, this

2    week, sentenced another January 6 defendant, Tony Gill, the

3    government was asking for two months.  I did not give him the

4    full two month.  I gave him 45 days.  And he was at the

5    Capitol for a very, very long time, helping and participating

6    -- well, encouraging the fighting against the officers in some

7    of the very, very worst fighting at the Lower West Terrace.

8        And unlike you, he didn't go to hear a speech, as you did.

9    He just kind of heard about the riots and decided to go lend a

10   hand.  I think your case is -- even though you did lie to the

11   FBI about it, I think your case is a bit different than his.

12   And so that's one of the cases I've considered.

13       So, based on my consideration of all the 3553(a) factors,

14   it is the judgment of the court that you, Spencer Offman, are

15   hereby committed to the custody of the Bureau of Prisons for a

16   term of 30 days on Count 1 of the information.

17       You are further sentenced to serve six months of supervised

18   release, to pay $500 in restitution to the Architect of the

19   Capitol, and to pay a mandatory $25 special assessment.  I

20   will waive imposition of a fine in this case because although

21   you are -- you don't earn money when you're incarcerated, and

22   given that you rent a room in a house and you seem to live a

23   very simple life, I'm not going to impose a fine here.  But I

24   am going to order that you participate in 60 hours of

25   community service and that be done in person, not online.

1    The special assessment is immediately payable to the Clerk

2    of the Court for the U.S. District Court of the District of

3    Columbia.  Within 30 days of any change of address, you shall

4    notify the Clerk of the Court of the change until such time as

5    the financial obligation is paid in full.

6        I will recommend to the Bureau of Prisons that you serve

7    your sentence -- is that Sheridan?

8            MS. IMHOLTE:  Correct.

9            THE COURT:  Sheridan.  BOP Sheridan.  I can only make a

10   recommendation to the BOP.  I can't order them to do anything.

11   I wish I could, but I can't.  But I'll make that recommendation

12   that you will be allowed to serve your sentence there, which

13   is close to home.

14       While you're incarcerated -- it's a relatively short

15   sentence, so I'm not sure what kind of programming that you

16   can participate in.  So I'm not going to recommend that you

17   participate in any particular programs while incarcerated.

18   But while on supervised release, you must abide by the

19   following mandatory conditions.

20       You must not commit another federal, state, or local crime.

21   You must not unlawfully possess a controlled substance.  I'm

22   not going to impose drug testing, but I am going to impose --

23   well, I'm going to order that you be assessed for alcohol

24   treatment.  I know you're in treatment now, but sometimes

25   these kinds of events in somebody's life can throw them off

1    track.  I don't want you to be thrown off track.  I think your

2    sobriety is very, very, very important, especially when

3    something stressful like this happens.  So I'm not going to

4    impose a drug-testing condition.

5        You must pay the special assessment that I impose in

6    accordance with 18 U.S.C. § 3013.  You must notify the court

7    of any material change in your economic circumstances that

8    might affect your ability to pay a restitution, and you must

9    make restitution as ordered by the court.

10       In addition, you must not use or possess alcohol during

11   your supervised release period, and you must be assessed for

12   alcohol treatment, outpatient treatment.  If ordered to enroll

13   in such treatment by the probation office, you must complete --

14   enroll in and complete such treatment.

15       You shall remove firearms, destructive devices, or other

16   dangerous weapons from areas over which you have access or

17   control until your term of supervised release is complete.

18       Probation office shall release the presentence

19   investigation report to all appropriate agencies in order to

20   execute the sentence of the court.

21       Does either side have any objection to any of the mandatory

22   or discretionary conditions that I've imposed?  Mr. Burkhead?

23           MR. BURKHEAD:  No objection, Your Honor.

24           THE COURT:  Ms. Imholte?

25           MS. IMHOLTE:  No objection.

1          THE COURT:  Okay.  Mr. Offman, you can appeal your

2     conviction to the court of appeals if you believe that your

3     guilty plea was somehow unlawful or involuntary or if there's

4     some other fundamental defect in the proceeding that was not

5     waived in your plea agreement.

6        You also have the right to appeal the sentence that I've

7     imposed subject to certain rights of appeal that you waived as

8     part of your plea agreement in this case.  If you choose to

9     appeal, you must file an appeal within 14 days after I enter

10    judgment.  If you are unable to afford the cost of an appeal,

11    you may request permission from the court to file an appeal

12    without cost to you.

13       Were there any other counts in the information that require

14    dismissal at this time, Mr. Burkhead?

15          MR. BURKHEAD:  Yes, Your Honor.  There was four counts

16    in total.  Mr. Offman pled to Count 1.

17          THE COURT:  Are you going to move to dismiss the

18    remaining counts?

19          MR. BURKHEAD:  Yes, Your Honor.  I'll do that orally

20    now, and I can follow that up with a written motion if the

21    court would like me to do that.

22          THE COURT:  You don't need a written motion.  An oral

23    motion is fine.

24          MR. BURKHEAD:  All right.  I so move then, Your Honor.

25          THE COURT:  The motion is granted.  The remaining

1    counts of the information will be dismissed.

2        Mr. Offman, one of the final things that I have to decide,

3    although the government is not asking for you to be detained

4    pending sentencing, I still have to make that independent

5    determination.  And this is where I told you before about your

6    compliance on pretrial release would be important.

7        And you have been compliant, and therefore I am going to

8    allow you to remain on release pending your voluntary

9    surrender.  That will be determined by your lawyer and the

10   probation office.  You must surrender on the date you are

11   ordered to do so.  Failure to do so could result in imposition

12   of another charge, the sentence for which would run

13   consecutive to any sentence in this case.

14       And I'll tell you, in almost every single case where the

15   defendant pleaded guilty to an offense for which there was not

16   mandatory detention, I have allowed them to remain on release,

17   and so far, only one case has a person not shown up, and I

18   believe they'll be located eventually.  But I'm going to allow

19   you to do this because of your compliance on pretrial release.

20       Now, you must continue to abide by all the conditions of

21   your release.  A failure to do so during this period could

22   result in me revoking your conditions of release; you could

23   begin serving your sentence immediately.  In addition, if that

24   happens, you could also be subject to a contempt of court

25   citation.  And if you commit a new offense while on release

1    pending sentencing, you could be subject to an enhanced

2    penalty.

3        So the long and short of it is continue to comply with your

4    conditions of release, don't get in any trouble, turn yourself

5    in on the date that you're supposed to.  Every now and then

6    I've had motions that something's come up, medical reasons or

7    others that you need to delay that surrender date.  If that

8    happens, you need to have your lawyer file a request for an

9    extension.  Without such an extension from the court, though,

10   you must turn yourself in on the designated day.

11       All right.  Mr. Offman, as I said before, you seem to be

12   a seeker and a searcher, and I know this will continue.  You

13   know, it's definitely an unfortunate result of one of your

14   adventures, but I hope you learn from it and you keep on

15   growing and learning as you have been.

16       One of the things I always tell defendants, and I will tell

17   you the same thing, is Bryan Stevenson once said we're not the

18   worst thing we ever do.  You're not the worst thing you've

19   done.  You're young and you're going to continue to learn and

20   to grow, and I hope you learn from this.  And I have every

21   reason to believe that you will move on past this and live a

22   productive life.  So I wish you good luck in that, sir.

23           THE DEFENDANT:  Thank you, Your Honor.

24           THE COURT:  Anything further?

25           MR. BURKHEAD:  Not from the government, Your Honor.

1          THE COURT:  All right.  Thank you, everyone.  Have a

2    good weekend.

3          MS. IMHOLTE:  Thank you.

4          THE DEFENDANT:  Thank you.

5       (Proceedings adjourned at 11:57 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne